**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Md Shakhawat Hossain, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING DEFENDANT'S** |
| | ) | **MOTION FOR SUMMARY** |
| vs. | ) | **JUDGMENT** |
| | ) | |
| Job Service North Dakota, | ) | Case No. 1:20-cv-009 |
| | ) | |
| Defendant. | ) | |

Before the Court is a Motion for Summary Judgment filed by Job Service North Dakota ("JSND") on August 27, 2021. (Doc. No. 49). For the reasons that follow, the motion is granted.

## I.   **BACKGROUND**

Hossain is a native of Bangladesh. (Doc. No. 4 at p. 11). He was in the United States on an F-1 Visa for most if not all of the time relevant to this action. An F-1 Visa allows nonimmigrants to enter the United States as full time students at accredited universities authorized by the United States to accept international students. U.S. Citizenship and Immigration Services ("USCIS"), F1 Student Visa, https://www.uscis.gov/ working-in-the-united-states/students-and-exchange-visitors /students-and- employment  (last visited March 28, 2023).

Hossain was enrolled at the North Dakota State University ("NDSU") from August 19, 2015, until May 31, 2017, when he graduated with a master's degree in computer science. (Doc. No. 51-1). Upon graduating, he applied and was approved for Optional Practical Training ("OPT").

OPT allows nonimmigrant students who are studying or have graduated to temporarily work in their major field of study for an employer in the United States. 8 C.F.R. §§ 274a.12(c)(1)(3) and 214.2(f)(10)(ii). Students in any field can secure "post-completion" OPT for up to 12 months. 8

1

C.F.R. 214.2(f)(10)(ii)(A)(3).  Students with a degree in science, technology, engineering, or math may get a two year "STEM extension" for total of 36 months provided they meet certain qualifications. 8 C.F.R. § 214.2(f)(10)(ii)(C).  For example, they must work for an employer that is enrolled in E–Verify and remains a participant in good standing with E–Verify.  8 C.F.R. § 214.2(f)(10)(ii)(C)(5).

E-Verify, authorized by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, is a web-based system through which employers can electronically confirm an employee's work authorization status.  <u>Chamber of Com. of U.S. v. Whiting</u>, 563 U.S. 582, 590 (2011). Participation in the E-Verify program is voluntary at the national level.  <u>Id.</u> at 627 (J. Breyer, dissent); <u>see also</u> <u>Arizona Contractors Ass'n., Inc. v. Napolitano</u>, No. CV07-1355PHXNVNW, 2007 WL 4570303, at *14 (D. Ariz. Dec. 21, 2007).  Some states require E-Verify for some or all of their employers.  <u>See</u> USCIS, E-Verify Mandatory States, https://www.e-verify.gov/about-e-verify/ history-and-milestones (last visited March 28, 2023).  North Dakota is not one of them.

Hossain was hired by and began working for JSND as a Programmer Analyst on July 7, 2017.  (Doc. No. 41-2).  At the outset of his employment, he presented Form I-766, an employment authorization document, to establish his identity and eligibility to work in the United States.  (<u>Id.</u>). Verification of his employment eligibility was documented on Form I-9.  (<u>Id.</u>).  On his Form I-9, Hossain attested that he was authorized to work until June 26, 2018.  (<u>Id.</u>).

On February 9, 2018, Hossain sent the following instant message to Jason Sutheimer ("Sutheimer"), JSND's Human Resource Manager:

> i know job service enrolled in to E -verify programme.What was the Zipcode used
> for 5806 and 5801?

(Doc. No. 51-6) (errors in original).  Sutheimer responded:

I'm not sure that JSND is enrolled in E-Verify.  I say this because when at NDDOT
we were not allowed to do that because HRMS had to do so, and the refused because
of a few requirements.

* * *

I can definitely check on that for sure though and let you know.

***

if we did, I think it would be 58501 (HRMS's zip)

***

I will check for sure

(Id.) (errors in original).

Hossain was apparently operating under the mistaken belief that JSND was an E-Verify

employer as it was listed on the Department of Homeland Security's ("DHS") website.  (Doc. No.

51-17 at ¶ 6).  According to Sutheimer, JSND was not an E-Verify Employer but rather an E-Verify

Employer Agent and was listed as such on the DHS's website.  (Id.). This distinction, though small,

was significant.  As an E-Verify Employer Agent, JSND was authorized to provide the service of

verifying employees as a third party to clients (employers) through the use of E-Verify.  See USCIS,

Supplemental Guide for Web Service Users, https://www.e-verify-gov/supplemental-guide-for-web-

services-users/10-introduction (last visited March 28, 2023).  However, it was not itself an E-Verify

Employer.  Consequently, employment with it could not be used to obtain a "STEM Extension."

On February 27, 2018, Connie Johnson, a JSND Human Resource Officer, emailed Hossain

to remind him that his employment authorization was expiring in approximately four months.

This email is to follow up on the notation of the Employment Eligibility Verification
(I-9) form that is part of the new hire orientation process.  That notation indicates an
expiration date of 6/26/2018 on form I-766 in regard to the authorization to work.

> We know that sometimes acquiring information from various agencies can take time; therefore, HR is providing this notification in advance of the expiration date. Shakawwat, if you could reply to this email with the status of acquiring a new document with an extended authorization to work date, that would be greatly appreciated.

(Doc. No. 41-3).

JSND considered enrolling in E-Verify as an employer in order to assist Hossain with his expiring employment authorization. According to Sutheimer, he "met with numerous officials to determine if JSND should proceed with obtaining an E-Verify Employer account" as it was his "understanding that an E-Verify [Employer] account was required for the [Hossain] to be able to extend his work authorization pursuant to the STEM OPT program." (Doc. No. 51-17 at ¶ 7). After some discussion, Human Resources started the process of enrolling in E-Verify as an employer. (Id.). JSND later reversed course for reasons discussed below and withdrew from the enrollment process prior to its completion. (Id.).

In the interim, Hossain periodically contacted Sutheimer for updates regarding JSND's enrollment in E-Verify. On April 13, 2018, Sutheimer advised Hossain that he had contacted the Director of Human Resource Management Services ("HRMS"), which in turn had advised that it would reach out to the Office of Management and Budget's Director and Payroll Manager to "see where things were at." (Doc. No. 51-12 at p. 2). On May 1, 2018, Sutheimer advised Hossain that he was waiting to hear back from HRMS and could not make any guarantees. (Id. at pp. 4-5). When asked by Hossain what would happen if his employment authorization expired prior to JSND's enrollment in E-Verify, Sutheimer responded that "we have to terminate your employment until your authorization is renewed" but that "[I]'m hopeful that we can get it resolved before that happens" and "[t]hat's why I've been pushing to see if HRMS can get something done for us." (Id.). On May

9, 2018, Sutheimer advised Hossain that there was nothing new to report as he had yet to hear back from HRMS. (Id. at pp. 8-9).

On May 11, 2018, Hossain filed an application for asylum with USCIS. (Doc. Nos. 4 at p. 7; 51-17 at p. 8). According to Hossain, he contacted USCIS to apply for asylum because he "felt My Supervisor and some co-workers are deliberately wanting to send me back to my national origin although I had right to work at Job service North Dakota." (Doc. No. 4 at p. 7).

On May 23, 2018, Hossain's supervisor, Amy Shawver-Morman ("Shawver-Morman"), contacted Sutheimer to inquire about the status of Hossain's employment authorization. (Doc. No. 51-2).

On June 11, 2018, Sutheimer messaged Hossain to advise that he was "working on getting E-Verify set up" and to inquire about Hossain's documentation. (Doc. No. 15-12). On June 12, 2018, he informed Hossain that he had applied for an E-Verify account. (Doc. No. 51-5). In addition, he sent Hossain a copy of "The E-Verify Memorandum of Understanding for Employers" that he had signed electronically on June 11, 2018. (Id.).

As of June 14, 2018, Sutheimer was still working with Hossain to complete the necessary paperwork and enrollment process in E-Verify. (Doc. No. 51-12, pp. 13-14). On or about June 14, 2018, Hossain presented to JSND an 1-20 Certificate of Eligibility for Nonimmigrant Student Status authorizing a "STEM extension" from June 27, 2018, through June 26, 2020. (Doc. No. 51-1).[1]

The following appears to have occurred on or around June 18, 2020.

•    Hossain arranged to twice meet with Sutheimer. (Doc. No. 51-12 at pp. 16-17).

•    Shawver-Morman reached out to a former JSND employee, Anjani Adususmilli, who

---

[1]   The I-20 was signed by a designated school official on June 14, 2018, and by Hossain on June 17, 2018. (Doc. No. 51-1).

5

had faced similar work authorization issues as Hossain for advice and assistance regarding Hossain's situation and to otherwise inquire who he retained as legal counsel. (Doc. No. 51-17 at p. 5-6). Shawver-Morman sent the following email to Sutheimer to advise him of her efforts.

> Subject: Maruf
>
> I just got off the phone with Anjani to have him find the name and contact information of the attorney he used for his immigration stuff. He was thinking that he might be willing to do a free consult. Maybe. I'm thinking it may just be quicker to call this guy and see if he's willing to talk to us, as he would be an expert on immigration, to see if he can at least lay out what options we have. Thoughts?

(Doc. No. 51-3 at p. 4).

- JSND Deputy Director Darren Bostrom ("Brostrom") and JSND Executive Director Michelle Krommer ("Krommer") met to discuss a request from Human Resources to enroll in E-Verify to assist an employee, presumably Hossain (Id. at ¶ 6). At this meeting the decision was made not to enroll in E-Verify "due to the requirements and liabilities with E-Verify which includes a change in I-9 procedures, the agency's liability associated with reporting I-9 information, known system issues with E-Verify, and Ms. Krommer's direct experience with utilizing E-Verify prior to employment with JSND." (Id.). Bostrom passed this information on to Sutheimer along with the directive that he stop the E-Verify enrollment process. (Id. at ¶ 7).

On June 19, 2018, Sutheimer notified Hossain of JSND's decision to withdraw from the E-Verify enrollment process. (Doc. No. 51-17 at ¶ 7). He also spoke with Hossain's designated school officer at NDSU to discuss Hossain's options. (Doc. No. 51-3).

On June 20, 2018, Suthheimer apparently met with Hossain to discuss his options going

6

forward.  (Doc. No. 51-16 at ¶ 9).  That same day JSND gave Hossain notice of his proposed termination, explaining that federal law prohibited him from working at JSND once his work authorization expired and that his employment with JSND would therefore terminate effective June 26, 2018, unless he could provide proof of his eligibility to work in the United States.  (Doc. No. 41-4).  Hossain acknowledged receipt of this notice and later sent an email to Shawver-Morman, expressing his gratitude for the "wonderful oppportunity here at Job Service" and requesting to "use the rest of the 6 days as [his] paid holiday."  (Doc. Nos. 41-4 and 51-11).

On June 21, 2018, Hossain sent the following email to Krommer, requesting that JSND reconsider its position with respect to E-Verify.

> I have been working with Job Service North Dakota for last 11 months under Employment Authorization in web team as a Programmer Analyst III.  I has been working with Amy Shawver and Jason Suttheimer regarding extending my work authorization as Job service North Dakota is enrolled into E-Verify programme.  They have been very helpful regarding this issue and they also worked with my school DSO regarding issuing my I-20s from Department of Homeland Security, which I needed to mail it back to USCIS in order to issue my work Authorization extension.  But, after issuing all of the papers and being helpful Jason Sutheimer told me on 19th June that Executive Director have decided to cancel the enrollment from E-verify.  As for issuing I-20s, E-verify enrollment is necessary, I-20s had been issued and Jason gave E-verify number to my School DSO, we had been a E-verify employer before 19th June.  As part of federal law requirement, as my current EAD card is Expiring, my I-20s along with other papers need to be at USCIS before 26th June.  I am in a real frustrating situation right now.  Can you please consider the scenario and issues about enrolling into E-verify so that I can still send my papers to USCIS office and be part of team Job Service.

(Doc. No. 51-12 at p. 21) (errors in original).  Hossain apparently met with Sutheimer and Shawver-Morman shortly after sending the aforementioned email.  (Doc. No. 51-12 at p. 22).  Following this meeting, Sutheimer followed up with Brostrom, advising that he, Shawver-Morman, and Hossain had discussed Hossain's aforementioned email to Krommer and why JSND had decided not to enroll as an E-Verify Employer.  (Id.).  He further advised Brostrom that Hossain had "stated that he is

resigning today, to focus his efforts on finding another E-Verify employer prior to losing his work

authorization." (Id.).

On June 21, 2018, Hossain submitted the following letter of resignation:

It's been my pleasure to be part of team Job service for almost a year working as Programmer Analyst III at web team. I have been working under Employment Authorization Card which has a validation date 26th June of 2018. In order to extend my work Authorization Job Service North Dakota needed to be enrolled into e-verify System again.  I have been working with Amy Shawver, my supervisor and HR Director Jason Sutheimer regarding extending my work authorization as Job service North Dakota had been enrolled into E -verify programme. They have been very helpful regarding that issue and they also worked with my school DSO regarding issuing my l-20s from Department of Homeland Security, which I needed to mail it back to USCIS to issue my work Authorization extension . But, after issuing all of papers and being helpful Jason Sutheimer officially informed me on 19th June that Executive Directors have decided to cancel the enrollment from E-verify. As for issuing l-20s, E-verify number and E-verify enrollment is necessary, l-20s had been issued and Jason Sutheimer gave E-verify number to my School DSO, Job Service had been a Everify employer before 19th June. As part of federal law requirement, I need an employer who is currently enrolled into e-verify and work is related with Information Technology to extend my work authorization. In order to try my best to find an e-verified IT company before 26th , I need to spent more time on Job Searching. That's why, I would not be able to work here anymore. It has been wonderful to be part of team Job Service.

(Doc. No. 41-5) (errors in original).  JSND accepted Hossain's resignation effective at 5:00 PM on

June 21, 2018.  (Doc. No. 51-9).

JSND apparently began soliciting applications for Hossain's position about a month after his

departure.  (Doc. No. 51-4).  Put another way, it waited for about a month before it tried to fill

Hossain's vacated position.  (Id.).  It filled the position in October 18, 2018, with an individual of

a different race, religion, color, and national origin than Hossain.  (Doc. No. 4 at p. 11).

Hossain obtained a new work authorization.  (Doc. No. 51-13 at pp. 56-57).   According to

an  email sent by Hossain to Brenda Halvorson, an employee of the North Dakota Department of

Labor and Human Rights, on April 17, 2019, he received his work authorization sometime in March

2019.  (Doc. No. 51-4 at p. 2).

Hossain at some point unsuccessfully applied for an open position at the North Dakota Attorney General's office. (Doc. No. 4 at p. 10).  He apparently reached out to JSND in February 2019 to inquire about his reinstatement to the position from which he had previously resigned.[2]

In April 2019, Hossain filed a Charge of Discrimination with the North Dakota Department of Labor and Human Rights, alleging:

> During my employment [with JSND], I was subjected to hostile working environment harassment, based on my color/Brown, race/Asian, national origin/Bangladesh, sex/Male, religion/Islam, marital status/Single (state only), Lawful Activity (building a personal relationship outside of the workplace) (state only) an din retaliation for participating in protected activity (reporting harassment to Homeland Security).  Some examples are:
>
> - Some of my female coworkers, Amy Carlson and Connie Johnson, as well as my Supervisor Amy Shawver, approached me for the prospect of marriage.  They felt I should be married to one of my female coworkers. I felt this was harassment based on my sex and marital status.  I also felt this was harassment based on my lawful activity outside of the workplace, in that, I was attempting to build a personal relationship outside of my workplace, and my coworkers and supervisor knew about it and tried to get me to marry someone in the workplace.
>
> - In May 2018, Amy Shawver approached me in the parking lot and asked me when I as going to get married. (Based on marital status).
>
> - Amy Shawver and Mathwitch Tyler (coworkers) tried to instill fear in my by telling me about previous coworkers who were discharged from their employment (Based on race, national origin, color, and religion.)
>
> - Mathwitch Taylor asked me, "So, a master's degreee holder like you is not going to throw a bond [are you]?" (Based on race, national origin, color, and religion.)
>
> - Amy Shawver told me in a passive aggressive manner that, I was not able

---

[2] Hossain states in his complaint that he called Jason Suthheimer in February 2019 after getting a new Employment Authorization Document.  (Doc. No. 4 at p. 10).  In his April 17, 2019 email to Halvorson, he states that he called JSND the first week in March to inform it that he had obtained work authorization.  (Doc. No. 51-4 at pp 2-3).

to manage my daily meal in my country (Bangladesh), and now in the United States of America I was able to get some food, have a job, even get a salary, so what more should I expect? (Based on race and national origin.)

- Rumors were going around the workplace that I was going to sue somebody. Karla Duray, team member, tried to point out these rumors, using the phrase, "these days even a port start is suing our presidence," suggesting that an Asian suing a Caucasion is not a big deal. (Based on race.).

On May 11, 2018, I contacted Homeland Security and applied for political asylum. In my Asylum Application, I reported the harassment I was experiencing in my workplace. The Respondent had access and knowledge of my report, as I kept a copy of it on my work computer.

On June 20, 2019, I was discharged from my employment. The Respondent stated it could no longer employ me, because it was not an "E-Verify" employer. I was forced to sign discharge papers. I believe I was discharged based on my color, race, national origin, sex, religion, marital status, lawful activity, and/or in retaliation for participating in a protected activity (reporting discrimination to Homeland Security).

I believe I have been discriminated and retaliated against in violation of the North Dakota Human Rights Act (N.D.C.C. ch. I 4-02.4) as amended, and Title II of the Civil Rights Act of 1964, as amended.

(Doc. No 41-6) (errors in original).[3]

The North Dakota Labor Department subsequently transferred Hossain's Charge of Discrimination to the Equal Employment Opportunity Commission ("EEOC"). (Doc. No. 41-8). It advised Hossain of this transfer in a letter dated June 28, 2019. (Id.).

The EEOC dismissed Hossain's claims against JSND. (Doc. No. 41-09). In a "Dismissal

---

[3] Hossain has filed charges of discrimination against others. In his answers to JSND's interrogatories, Hossain advised that he filed a charge of discrimination with the EEOC against General Motors on the grounds that General Motors had discriminated against him on the basis of his race, religion, and national origin and had terminated his brief employment in its innovation center in Roswell, Georgia, on June 30, 2020, "as a retaliation for this lawsuit Hossain vs. Job Service North Dakota." (Doc. No. 51-13 at pp. 7 and 9). He further advised that he filed charges of discrimination against USM Business Systems, J&P Cycles, and JC Penney. (Doc. No. 51-13 at p. 8). It is not clear from his interrogatory answers when, with whom, or why he filed these charges, however. (Id.).

a Notice of Rights" dated October 28, 2019, it advised that the information it had obtained during its investigation did not establish any statutory violations by JSND  (Doc. No. 41-9).  It further advised Hossain of his right to sue under Title VII.  (Id).

Hossain initiated the above-captioned pro se and in forma pauperis on January 27, 2020, claiming that he was subjected to harassment, discrimination, and retaliation in violation of the North Dakota Human Rights Act ("NDHRA"), the Immigration Reform and Control Act, and Title VII of the Civil Rights Act.  (Doc. Nos. 1, 3, 4).  For support, he reiterated the allegations contained in the Charge of Discrimination.  Additionally, he cited his coworkers's conversations regarding marriage, politics, and Colorado's legalization of marijuana, and documents that he received in his mailbox,[4]  asserting they were particularly distressing as he "believed they were trying to relate to something from my national origin." (Doc. No. 4).  JSND filed its answer on April 13, 2020.  (Doc. No. 16).  The parties filed notices of their consent to the magistrate judge's exercise of jurisdiction in March 2020.  (Doc. Nos. 14-15).

JSND filed a Motion for Summary Judgment on August 27, 2021.  (Doc. No. 49).  Hossain filed a response to JSND's motion on September 21, 2021.  (Doc. No. 52).[5]  JSND filed a reply in support of its motion on October 5, 2021.  (Doc. No. 55).  Consequently, its motion is ripe for the court's consideration.

---

[4]  Hossain's complaint alleges: "I received some documents in my mailbox that has something to do with roughly similar to that 'internet access at home will be monitored." I believe that letter was sent to me for my national origin." (Doc. No. 4 at p. 6).

[5]  Hossain's response does not meet the requirements of this court's local rules regarding the "form of papers." Local 5.1(B) provides in relevant part that briefs must be typeset with a 12-point font or larger and must be double spaced.  See D.N.D. Civ. L.R. 5.1(B).  Hossain's response is typeset with a 9-point font and is single spaced.

II.    **STANDARD OF REVIEW**

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law.  Davison v. City of Minneapolis, 490 F.3d 648, 654 (8th Cir. 2007); see Fed. R. Civ. P. 56(a).  Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party.  Id.  The purpose of summary judgment is to assess the evidence and determine if a trial is genuinely necessary. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The Court must inquire whether the evidence presents a sufficient disagreement to require the submission of the case to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law.  Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005).  The moving party bears the responsibility of informing the court of the basis for the motion and identifying the portions of the record which demonstrate the absence of a genuine issue of material fact. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011).  The non-moving party may not rely merely on allegations or denials in its own pleading; rather, its response must set out specific facts showing a genuine issue for trial. Id.; Fed. R. Civ. P. 56(c)(1).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  If the record taken as a whole and viewed in a light most favorable to the non-moving party could not lead a rational trier of fact to find for the non-moving

party, there is no genuine issue for trial and summary judgment is appropriate. Matsushita, 475 U.S. at 587.

**III.   DISCUSSION**

    **A.   Hossain's Federal Claims**

       **1.   Immigration Reform and Control Act ("IRCA")**

IRCA prohibits employment discrimination on the basis of citizenship status, a proscription not encompassed by other anti-discrimination statutes.  8 U.S.C. § 1324b(1); Gen. Dynamics Corp. v. United States, 49 F.3d 1384, 1385 (9th Cir.1995). It also prohibits discrimination on the basis of national origin to the extent that the alleged discrimination is not already covered by Title VII.   8 U.S.C. §§ 1324b(a)(1) (stating the general rule) and 1324b(1)(2) (identifying three exceptions to the general rule).

JSND asserts that, as a state agency or department, is has Eleventh Amendment immunity from suit under IRCA.  See N.D.C.C. § 32-12.2-01(7); see also Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984) (holding that "in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment").  It further asserts that, the issue of sovereign immunity, IRCA does not apply in this instance as Hossain's claim of national origin discrimination is already covered by Title VII.

The Eleventh Amendment prohibits suits "in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.   The Supreme Court has construed this articulation of immunity as establishing that "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state."   Port Auth. Trans–Hudson Corp. v.

Feeney, 495 U.S. at 300 (citations and internal quotation marks omitted). This bar to suit is not absolute, however. A state may voluntarily waive its immunity and consent to suit in federal court. See Edelman v. Jordan, 415 U.S. at 673, 94 S.Ct. 1347.   In certain cases, Congress may also abrogate Eleventh Amendment immunity. See Fitzpatrick v. Bitzer, 427 U.S. 445, 456 (1976).  For example, "[w]hen providing funds from the federal purse, Congress may require as a condition of accepting those funds that a state agree to waive its sovereign immunity from suit in federal court." Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn, 280 F.3d 98, 113 (2d Cir. 2001) (citing Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 686-87 (1999);  South Dakota v. Dole, 483 U.S. 203, 207 (1987).  However, to abrogate the state's immunity, Congress must "unequivocally express[ ] its intent to abrogate the immunity."  Green v. Mansour, 474 U.S. 64, 68 (1985); see also Hensel v. Off. of Chief Admin. Hearing Officer, 38 F.3d 505, 508 (10th Cir. 1994) ("In order for the state to be subject to suit, Congress must have made its intention unmistakably clear in the language of the statute.") (internal quotation marks omitted).

Hossain asserts that JSND has generally waived its sovereign immunity because it has accepted federal funds.  However, given the explicitness Congress has employed with respect to other statutes, Hossain has not shown that Congress unequivocally intended to abrogate the Eleventh Amendment in IRCA.  See Hensel, 38 F.3d at 508; see also Fitzpatrick, 427 U.S. at 449 n. 2.  In contrast to, Title VII, which defines the term "person" to include governments, governmental agencies, political subdivisions and the term "employee" includes individuals subject to the civil service laws of a State government, governmental agency or political subdivision.  See 42 U.S.C.A. § 2000e(a) and (f).  The Age Discrimination in Employment Act, which defines an "employer" to include a State or any agency of a State.  See 29 U.S.C.A. § 630.  IRCA is devoid of any textual

support by definition or reference for the proposition that a "person" or "entity" includes the State. Absent explicit language, the court cannot find that IRCA was intended to subject the state to suit in federal court. See Hensel, 38 F.3d 505, 508.

"Furthermore, the Eleventh Amendment itself is not mentioned in the IRCA." Id. (contrasting IRCA to the Americans with Disabilities Act, which explicitly abrogates Eleventh Amendment immunity). Absent textual support, this court "cannot conclude that Congress intended to abrogate Eleventh Amendment immunity in the IRCA." Id.

Even if the court were to conclude that IRCA abrogated Eleventh Amendment immunity, IRCA has no application to the matter in dispute. As noted above, IRCA prohibits discrimination on the basis of national origin to the extent that it not already covered by Title VII. JSND is covered by Title VII and therefore subject to the Title VII. 42 U.S.C.A. § 2000e(a) and (f); Okruhlik v. Univ. of Arkansas ex rel. May, 255 F.3d 615, 627 (8th Cir. 2001) (holding that Title VII validly abrogated the States' Eleventh Amendment immunity); Hossain's IRCA claim is therefore dismissed. The court shall now turn to the Hossain's Title VII claims.

## 2.    Title VII

Title VII prohibits employment discrimination on the basis of race, color, religion, sex, or national origin. 42 U.S.C.A. § 2000e-2(a). A plaintiff may establish of violation of Title VII either through direct or indirect evidence. See Arraleh v. Cnty. of Ramsey, 461 F.3d 967, 974 (8th Cir. 2006). "Direct evidence is evidence that establishes a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employer's decision." Twymon v. Wells Fargo & Co., 462 F.3d 925, 933 (8th Cir. 2006) (internal quotation marks and alterations

omitted); see also Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004) ("'[D]irect' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence."). "Direct evidence does not include stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself." Id. (internal quotation marks and alterations omitted); see also Sellars v. CRST Expedited, Inc., 13 F.4th 681, 693 (8th Cir. 2021). Indirect evidence is other evidence that creates the inference of unlawful discrimination. See Arraleh v. Cnty. of Ramsey, 461 F.3d at 974. "Circumstances giving rise to an inference of discrimination include treating similarly situated employees who are not members of the protected class in a different manner." Gibson v. Am. Greetings Corp., 670 F.3d 844, 853-54 (8th Cir. 2012).

To assess Title VII claims based upon indirect evidence of discrimination, courts employ the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03. Under this framework, a plaintiff has the initial burden of establishing a prima facie case of discrimination. See Gibson, 670 F.3d at 853.

To establish a prima facie case for failure to hire, a plaintiff must demonstrate: (1) he is a member of a protected class; (2) he was qualified for the position for which the employer was accepting applications; (3) he was denied the position; and (4) the employer hired someone from outside the protected class. Arraleh v. Cnty. of Ramsey, 461 F.3d 967, 975 (8th Cir. 2006). To establish a prima face case of discrimination on the basis of race, color, religion, sex, or national origin, a plaintiff must demonstrate: (1) he is a member of a protected class; (2) he was meeting his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. See Gibson v. Concrete Equip. Co., Inc., 960 F.3d 1057, 1062 (8th Cir. 2020) (sex discrimination); Shirrell v. St. Francis Med. Ctr., 793 F.3d

16

881, 887 (8th Cir. 2015) (religious discrimination); Guimaraes v. SuperValu, Inc., 674 F.3d 962, 973–74 (8th Cir. 2012) (national origin discrimination); Gibson v. Am. Greetings Corp., 670 F.3d 844, 853-54 (8th Cir. 2012) (race discrimination).  To establish a prima facie case of hostile work environment, a plaintiff must show: (1) he is a member of a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic, in this case, on her race, sex, national original and religion; and (4) the harassment affected a term, condition, or privilege of employment.  See Soto v. John Morrell & Co., 285 F. Supp. 2d 1146, 1167 (N.D. Iowa 2003)  (citing Beard v. Flying J. Inc., 266 F.3d 792, 797 (8th Cir. 2001)); see also Carter v. Chrysler Corp., 173 F.3d 693, 700 (8th Cir. 1999).  "Where the harassment was at the hands of a co-worker, and not a supervisor, the prima facie case includes a fifth element requiring the plaintiff to show that the employer knew or should have known of the harassment, but failed to take proper remedial action."  Soto, 285 F. Supp. 2d at 1167 (citing Stuart v. General Motors Corp., 217 F.3d 621, 631 (8th Cir. 2000)).  To establish a prima facie case of retaliatory discrimination, a plaintiff must show: (1) he engaged in protected activity; (2) an adverse employment was taken against him; and (3) there was a causal connection between the two.  See Brower v. Runyon, 178 F.3d 1002, 1005 (8th Cir. 1999).  The burden of establishing a prima facie case is not onerous.  Texas Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 253 (1981).  Nevertheless, a failure to establish even one element of a prima facie case defeats a Title VII discrimination claim.  Tatum v. City of Berkeley, 408 F.3d 543, 550–51 (8th Cir. 2005).

If the plaintiff establishes a prima facie case of discrimination, the burden of production then shifts to the employer to articulate a legitimate, non-discriminatory reason for its action.  See id. If the employer makes such a showing, the burden shifts back to the plaintiff, who must then

demonstrate by a preponderance of the evidence that the defendant's proffered non-discriminatory

reason was pretextual.  See id.  "The plaintiff may prove pretext by 'adducing enough admissible

evidence to raise genuine doubt as to the legitimacy of [the defendant's  motive].'"  Id.  (quoting

Anderson v. Durham D & M, L.L.C., 606 F.3d 513, 521 (8th Cir. 2010)).

a.     <b>Failure to Hire</b>

Hossain's first Title VII claim pertains to JSND's failure to rehire him.  (Doc. No.  4).  His

complaint alleges:

> 30.  I applied for another state position . . . at Attorney General office, State of North
> Dakota, I mentioned job service North Dakota as a reference and previously
> employer, I believe job service North Dakota informed them advsersely against me
> so that I cannot get this role.
>
> 31.  In February 2019, after getting new Employment Authorization Document, I
> made phone call to HR Jason Sutheimer and after not getting any response I
> informed Ms. Shelley at North Dakota Governor office that I currently have another
> employment Authorization document although they already rejected a valid I-9
> document previously and it does not require e-verify.  I believe Ms Shelley informed
> Job service about my situation, but they refused to rehire me based on their words
> they gave me regarding possible reinstatement.  That slight hope I had based on the
> words Amy Shawver and Jason Sutheimer uttered before me asking me resignation
> was also gone and I felt empty and tricked.

(Doc. No. 4 at p. 10) (errors in original).

JSND asserts that, based on the facts alleged, Hossain has failed to state a prima facie case

for a failure to hire by virtue of the fact that he cannot establish as a threshold matter that he was

denied a position.  The court agrees.

It is clear from the record that, following his resignation, Hossain did not apply for an open

position at JSND.  It therefore follows that JSND did not deny him a position and that Hossain has

not stated a prima face case with respect to this failure to hire claim.

When Hossain resigned, JSND had no way of knowing when he would obtain another

18

employment authorization document much less if he would obtain such a document. After Hossain resigned, it apparently took JSND three months to fill his position. Hossain had no apparent contact with JSND during this time span. Hossain did contact JSND in February 2019, to advise that he had obtained the necessary authorization to commence working in the United States and to otherwise express his interest in re-employment at JSND despite all of the harassment to which he had allegedly been subjected prior to his resignation. His act of contacting JSND to advise of his willingness and ability to return work is not akin to submitting an application. Even if it could, there is no dispute that JSND had no open position for which Hossain could apply.

Hossain maintains that during his June 21, 2018, meeting with Shawver-Morman and Sutheimer, he was encouraged to resign with the understanding that he could be reinstated at a later date if his asylum application was approved or he otherwise obtained employment authorization. Specifically, he asserts:

> Jason Sutheimer told plaintiff that Michelle Kommer got back to him or them and do things in a proper way and explained to plaintiff that give defendant or them a resignation letter., it will appear as an "R" instead of "T" on plaintiff's record, as that could be detrimental for plaintiff for his employment at Job service North Dakota or at another potential Employer. Plaintiff raised other points for not to resign,. As the arguments and doubts continues, Jason Sutheimer went outside of his room and provided plaintiff instantly printed copy of Job Service North Dakota reinstatement policy pointing to document that even I resign it's not going to affect plaintiff's future reinstatement at Job Service North Dakota or paid holidays remains same. Resignation looks good on file as plaintiff's attorney told them, plaintiff is eligible for work-authorization based on your political asylum application, plaintiff can join them after the getting the work-authorization without going through competitive exam again. Amy Shawver sitting next to plain tiff stated she don't wan to go through the recruitment hassle until December or January of 2019 again and plaintiff will be reinstated. As plaintiff was pushed to resign with hope of rehiring, plaintiff reasonably considered providing resignation letter as term or agreement of getting reinstated based on new work documents.

(Doc. No. 52) (errors in original).

19

Assuming that what Hossain is represented is true, that he was told he could be reinstated if he obtained another employment authorization document, it does not constitute the basis for a cognizable claim.  The undisputed facts are that Hossain did not reapply and JSND did not otherwise have an open position for him in February 2019.  See Hughes v. Twenty-First Century Fox, Inc., 304 F. Supp. 3d 429, 445 (S.D.N.Y. 2018) ("failure-to-hire claim is distinguishable from other employment discrimination claims in that it necessarily applies in most circumstances to non-employees seeking employment positions rather than current employees.  The relevant employment status inquiry in a failure-to-hire claim is the status of the position an applicant is seeking rather than the current relationship between the applicant and the would-be employer." (internal quotation marks omitted)).  Other than Hossain's bald assertion that he resigned on the condition that would be reinstated at some future date, there is nothing in the record to evidence any sort of agreement between Hossain and JSND with respect to any future employment.  Any expectation Hossain may have had that JSND would hold a position for him indefinitely, not knowing if or when he would ever be able to fill it, or immediately create a new position for him when he contacted JSND in February 2019 is unrealistic and unreasonable, and not the basis for cognizable failure to hire claim.

Insofar as Hossain has asserted that the Attorney General's office did not hire him because JSND gave him a bad reference, the court makes the following observations.  First, the Attorney General's office is not a party to this action and its hiring practices are not the subject in dispute.  Second, assuming for the moment that Hossain met the qualifications for an open position at the Attorney General's office, Hossain's pleadings are devoid of any allegation that this position was ultimately filled by someone outside a protected class.  Third, Hossain's assertion that JSND had

20

a hand in the Attorney General's office's decision not to hire him is conclusory, self serving, and at this point supported only by Hossain's suspicion. Fourth, it is not clear at this point that the Attorney General's office could have hired him (or that JSND could have rehired him in February 2019) as it not entirely clear that he had received authorization to work in the United States at that point.  According to an email sent by Hossain to Brenda Halvorson on April 17, 2019, Hossain had only obtained new work authorization the previous month.  (Doc. No. 51-4 at p. 2 ("After just about one month (if I can remember correctly) Job Service north Dakota advertised for the position I worked for.  **I got my work Authorization based on my asylum application on last month beginning of march.  before that I did not have a work authorization let alone a job**.") (errors in original, emphasis added)).

In sum, it is axiomatic that a failure to hire cannot stand when the employer had no openings and was not hiring.  Hossain's "failure to hire" claim is therefore dismissed. The court will now move on to a discussion of Hossain's claim of race discrimination.

### b.    Racial Discrimination

Hossain claims that he was discriminated against and otherwise harassed because he is Asian. (Doc. No. 4).   As direct evidence of racial discrimination, he cites comments by coworkers, which he described/summarized in the Charge of Discrimination filed with the North Dakota Labor Department.(Doc. No. 4-1 at p. 3). As indirect evidence, he cites, among other things, statements made by and treatment he received from his superiors during the hiring process through his resignation.

As previously noted, stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself are not considered direct

evidence of discrimination.  Here, the comments at issue can fairly be characterized as such as they are largely made by nondecisionmakers, are facially neutral and arguably innocuous, and are in no way connected to any adverse employment decision.  See e.g., Guimaraes v. SuperValue, Inc., 674 F.3d 962, 924-75 (8th Cir. 2012).  Consequently, they do not constitute direct evidence of race discrimination and do provide the basis for a cognizable claim of race discrimination.  Utilizing McDonnell Douglas framework, the court shall therefore move on to address what Hossain asserts is indirect evidence of discrimination.

JSND does not dispute that Hossain is a member of a protected class or that Hossain met its legitimate expectations while in its employ.  Rather, it asserts that Hossain did not suffer an adverse employment action for purposes of Title VII and therefore has failed to establish a prima facie claim  of race discrimination.  Hossain naturally disagrees, attributing his separation from JSND to his termination as opposed to his resignation and further asserting:

> Racially charged code words may provide evidence of discriminatiory intent by sending clear message and carrying the distinct tone of racial motivations and implications....
>
> Comments made by Jason sutheimer was something similar to the effect "these Eads are for par time job" Id.  Referring to plaintiff should work for part time job although working at Job service of North Dakota on a full-time basis is clearly disparaging "not facially or racially neutral."  These EADS  "clearly referring to a class of people could reasonably point to alienage or national origin, or minority race in USA or both of these classes of people.  Coupled with other comments made by Jason Sutheimer and Other decision makes and analyzing under Espinoza, even considering "EADs" referring to alienaage or citizenship status raises an inference of discriminatory motive based on national original because of the disparaging part of the comments wanting plaintiff to "work at part-time job.  Later, Jason sutheimer also commented during termination process that "plaintiff should work for $10/hr. Job" . . . Overall, raises inference of discrimination based on national origin, race or not allowing plaintiff to work there although federal and state law allows although based on class animus.
>
> Section A. at 5, 10, 12 ¶ 15, 32, 36, 37, 39 comments by Amy Shawver Morman,

plaintiff's direct supervisor coupled with Matthwich Taylor considering under Cat's paw see raises inferences of discrimination based on national origin, race, color, religion for terminating plaintiff although plaintiff had a lawful I-9 document to continue his work at Job Service North Dakota.

(Doc. No. 52) (errors in original).

"An adverse employment action is defined as a tangible change in working conditions that produces a material employment disadvantage, including but not limited to, termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge." Jackman v. Fifth Jud. Dist. Dep't of Corr. Servs., 728 F.3d 800, 804 (8th Cir. 2013) (further noting: "[M]inor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action." Here, it is clear from the record that Hossain resigned his employment at JSND and therefore did not suffer an adverse employment action for purposes of Title VII.

As discussed above, JSND was not required by federal or state law to enroll as an E-Verify Employer.  Its decision not to enroll cannot construed as adverse employment action in the context of Title VII.  To conclude otherwise would effectively mandate employer participation in e-Verify.

Apparently unable to find alternative employment with an E-Verify employer, Hossain was unable to obtain a "STEM extension" of his OPT and his work authorization expired on June 26, 2018.  Because his work authorization expired, he could no longer legally work in the United States.  Because Hossain occupied a classified position, JSND was required to issue a pre-action notice to Hossain that advised he would be terminated on the date his employment authorization expired, unless he could provide authorization for employment beyond that date. JSND submits that this pre-action notice did not constitute an adverse employment action because it does not materially

disadvantage Hossain.  The court agrees as this notice did not operate to terminate Hossain's employment but rather reminded Hossain that, absent new or additional work authorization, his current work authorization would expire and employment with JSND would come to an end by operation of federal law on June 26, 2018.  Rather than simply wait for his current work authorization to expire, Hossain resigned on his own volition.

As Hossain did not suffer an adverse employment action for purposes of Title VII, he has not met one of the elements necessary to state a prima face claim.  Consequently, his claim does not survive summary judgment.  <u>Tatum v. City of Berkeley</u>, 408 F.3d 543, 550–51 (8th Cir. 2005).

Even if the court were conclude to that Hossain had suffered an adverse employment action for purposes of Title VII, Hossain's claim would still fail on summary judgment as there is nothing in the record from which in inference of discrimination can be inferred.

As best as the court can discern, Hossain's indirect evidence of racial discrimination consists of the following: (1) comments allegedly made by Suttheimer regarding employment authorization documents or "EADS" and part time employment when exploring Hossain's options in the summer of 2019; (2) Shawver-Morman's insistence during the hiring process that he submit specific I-9 documents "issued by USCIS in card form rather than which can be issued by DSO in shorter timeframe (10-14 days) also issued by Department of Homeland Security"; and (3) differences in how he was treated in comparison to other JSND employees.  (Doc. Nos. 52 at p. 16;  51-13 at pp. 13-15).  With respect to different treatment of JSND employees, he asserts: "Plaintiff was treated differently assigning employment instructions, terms (like laptops, computer access, and mixing with co-workers etc.) based on protected grounds as well" and that "I was not provided with a laptop after I finished my probationary period till the end of my employment although every other team

member had laptops." (Doc. Nos. 4 at p. 7, 51-13 at p. 15).

Contrary to Hossain's assertion, comments attributed by Hossain to Sutheimer about EADS and his work options do not create an inference of discrimination. Hossain was meeting with Suthheimer to discuss his efforts to obtain another EAD and his options. Therefore, it would only be natural that they discussed the topics of EADs and the types of employment available to him. The suggestion that the discussion of these topics is suggestive of discriminatory intent or animus stretches logic to its breaking point. The same can be said with respect to Shawver-Morman and the paperwork that she required from Hossain during the hiring process. Tellingly, there is nothing in the record to suggest that Hossain's hiring process and the documents that JSND required was any different than any other nonimmigrant seeking employment with JSND. If anything, Shawver-Morman's requirements of Hossain reflect the care she was taking to make sure that all i's were dotted and t's crossed given the liability employers face if they hire someone without proper authorization to work in the United States.

With respect to different treatment, the court does not understand what Plaintiff means when stating that he "was treated differently assigning employment instructions." To the extent that he asserting is that he was subjected to different terms and conditions of work and was otherwise treated differently at work account of his race, he does not articulate (or articulate in away the court understands) how his work conditions were different than others employed by JSND beyond the fact that his term of employment was finite by virtue of his status as a nonimmigrant student. Rather, he provides blanket, conclusory assertions of discrimination on the basis of race.

With respect to laptops, even if he was not provided one while others were, it does not create an inference of discrimination, particularly in light of Hossain's references in his complaint to his

"work computer." (Doc. No. 4 at p. 7).  As an aside, the record reflects that Hossain was instant messaging and emailing his supervisors regularly, evincing that he had some level of ongoing computer access.

In the face of Hossain's claim of discrimination, JSND has articulated a legitimate nondiscriminatory reason for its decision not to enroll in E-Verify as an employer.  As explained to Hossain when the decision was made not to enroll, JSND determined that enrolling in E-Verify would require it to change its I-9 procedures, affect its liability with respect to its reporting of I-9 information through E-Verify, and present a system issue known to E-Verify participants. (Doc. No. 51-12 at p. 22).  Because Hossain's work authorization was nearing its end, JSND was obligated by N.D. Admin. Code § 4-07-19-05 to provide Hossain with a pre-action notice of what would occur upon expiration of his work authorization.

Hossain has presented nothing that suggests that the reasons give by JSND by its decision not to enroll in E-Verify and issuance of a pre-action letter was pretextual and that his race was a motivating factor for anything.  Rather, he asserts that "JSND determined to withdraw from already enrolled e-verify in order to terminate plaintiff by refusing to accept plaintiff's already issued I-9 document in possession by providing a false reason on pre-action notice and disciplined plaintiff under N.D. Admin. Code § 04-7-19-015." (Doc. No. 4 at p. 24) (errors in original).  Clearly, Hossain did  not fully appreciate the distinction between an E-Verify Employer and an E-Verify Employer Agent.  The law is clear that JSND was not required to enroll as employer in E-Verify. The record is clear that  JSND was at no time an E-Verify Employer. As for the pre-action letter, it was issued in accordance with the state's administrative code.

### c.      Color Discrimination

"Color discrimination arises when the particular hue of the plaintiff's skin is the cause of the discrimination, such as in the case where a dark-colored African–American individual is discriminated against in favor of a light-colored African–American individual." L. v. Norfolk S. Corp., No. 4:15-CV-924-CEJ, 2015 WL 5886069, at *3 (E.D. Mo. Oct. 8, 2015) (quoting Bryant v. Bell Atl. Maryland, Inc., 288 F.3d 124, 135 (4th Cir.2002)).  "As the EEOC has explained, 'color discrimination occurs when a person is discriminated against based on the lightness, darkness, or other color characteristic of the person" and "[e]ven though race and color clearly overlap, they are not synonymous."   Id.   (citing U.S. Equal Emp. Opportunity Comm'n, No. 915.003, EEOC Compliance Manual, Section 15: Race and Color Discrimination, at 6 (Apr. 19, 2006), http://www.eeoc.gov/policy/docs/race-color.pdf)).

JSND asserts that, with respect to his claim for color discrimination, Hossain has done little more than check the box for "color" on the charge of discrimination form and that he has failed to state a prima facie case.  See Laws v. Norfolk Southern Corp., 415 CV-924-CEJ, 2015 WL 5886069, at * 3.

Hossain's complaint his devoid of any specific factual allegations that suffered any adverse employment action or was otherwise discriminated against on account of his skin color.  Put another way, he has not presented facts that link his treatment at work was a factor in JSND's decision not to enroll in E-Verify or issue a pre-action letter to the extent they could be considered adverse employment actions.

### d.      Sex Discrimination

Hossain asserts that the court can infer from his coworker's comments and questions about

his materal status that he was discriminated on the basis of his sex and marital status.  Specifically,

he assets:

> 1.   On May 30th, 2017, before sending me the employment offer letter, my supervisor Amy Shawver Morman asked me how many years of work authorization do you have?  After I answered that question my supervisor Amy Shawver Morman again asked me "after that"?  I told her that I am thinking to get married here (in good faith).  I believe reveling marital status and intention was a cause to get the offer letter from my supervisor.

* * *

> 3.  For revealing that marital status and intention to my supervisor Amy Shawver and other co-workers, some of my Female co-workers, Amy Carlson Connie Johnson, as well as my supervisor Amy Shawver and co-worker Mathwich Tyler for his daughter directly or indirectly approached me for the prospect of marraige.  It took some time to take the decision regarding my marraige as I was doubtful about their intention. I believe they felt I should be married to one of my female coworkers or someone associated with them.  I felt this was harassment based on my sex and marital status. As I was not decided at that point regarding my marital decision, I did not respond to my co-workers direct and indirect marriage related building and later expressing harassments was a cause to take adverse decision by my Superior that led to my termination by force.  I lost employment, salary, experience, career.

* * *

> 17.  In May 2018, I asked her work extension e-verify questions and Amy Shawver Morman asked me when I was going to get married?  I also replied that I am going to get married to someone from my national origin here in USA. She intended to how limited employment terms based on my national origin and marital status.  Amy Shawver and Jason Sutheimer later refused to accept a valid work document and discharged me from the employment although I had right to work at Job Service North Dakota.

(Doc. No. 4 at pp. 5-8) (errors in original).  As he has not presented direct evidence of sex

discrimination in violation of Title VII, his claim is properly analyzed under <u>McDonnell Douglas</u>.

JSND again acknowledges that Hossain is a member of a protected class and that Hossain

met its legitimate expectations while in its employ.  And it again asserts Hossain did not suffer an

adverse employment action for purposes of Title VII and has therefore failed to state a prima facie

claim of sex discrimination.  The court agrees.

Hossain cannot establish that he suffered an adverse employment action.  JSND did not terminate Hossain's employment.  Hossain resigned.  Had he not resigned, his employment would have come to an end six days later when his work authorization expired.  As discussed above, neither JSND's decision not to enroll in E-Verify nor the pre-action letter constitute an adverse action for purposes of Title VII.

Even if Hossain could establish that he suffered an adverse employment action, he has failed to establish that circumstances give rise to an inference of sex discrimination.  Hossain has presented nothing of substance to support his claim that he was treated differently than similarly situated females.  Yes, he points to the comments of his coworkers regarding his marital status.  However, he makes no connection between these comments and any adverse employment action. In the end, his claim and supporting evidence boils down to the following: he was discriminated against because his coworkers talked to him about marriage and his marital status.  Absent more, such stray comments are not evidence of discrimination.  See Thomas v. Corwin, 483 F.3d 516, 540 (8th Cir. 2007).

If Hossain could establish a prima face case of sex discrimination, JSND has articulated a legitimate nondiscriminatory reason for its decision not to enroll in E-Verify as an employer as well as why it issued a pre-action notice to Hossain.  Notably, Hossain has presented nothing to even remotely suggest that the reasons articulated by JSND are pretextual.

### e.    Religious Discrimination

Hossain claims that he "was subjected to hostile working environment, harassment, based on . . . religion/Islam . . . ."  (Doc. No. 4 at p. 11).  Specifically, he alleges:

Based on my religion and national origin, I also believe Job Service North Dakota also had some stereotypes regarding security issues although I was working there satisfying all the federal and state laws. I also tried to cooperate with Human Resources and my supervisor several times regarding this matter by properly communicating with them in a regular manner. After all these efforts, at some point, I felt harassed and reported to Human resource manager Jason Sutheimer verbally that this delay or harassments affecting my work progress and creating emotional and mental pressure in me . . .

* * *

On 18th, 2018, In order to oppose discrimination I felt based on my national origin, religion, marital status I said to Jason Sutheimer that "I currently have a I-20 document issued by Department of Homeland Security and they issues two years of work Authorization" pointing to the already issued I-9 documents in my hand in an asserting manner to oppose their ongoing acts, words not to wanting to give me work extension in time and proper way after Jason Sutheimer commented "this e-verify number will not work."

* * *

On June 21st, 2018 Mattwich Tyler asked me, "So a master's degree holder like you are not going to throw a bomb are you? and intentionally revealed the reason that Job service North Dakota is removing me from the job. My supervisor asked me several questions regarding my religion previously revealing that she has also a stereotyped view about my religious creed and beliefs, I believe which was created against me inside the Job service North Dakota co-workers by only Muslim Community Center in Bismarck (religion) and Bangladeshi (national origin) Community at North Dakota through their personal connections for political rivalry at my national origin.

(Id. at pp. 7-9) (errors in original). In his response to JSND's motion, he cites additional questions

and comments made by his coworkers, his lack of a laptop, and mail that he received:

1. Before finishing the probationary period, IT manager Pat C Kelly (plaintiff supervisor's supervisor) asked plaintiff something similar to effect "what is the situation in [your] country?" plaintiff replied regarding what? Pat C Kelly replied something similar to effect "regarding religious and political situation? Plaintiff replied something similar to the effect "unrest in those matter" early sixty upheavals of socialism made this country into a secular country there is a division in the geopolitics between India and Pakistan and after that Pat C Kelly asked plaintiff based on what? Plaintff hesitated a little bit and replied him "religion" then he asked plaintiff"what is the major religion over there?" Plaintiff said "Islam". Plaintiff also stated something similar to the effect that "plaintiff feels some people still act like

in servitude [opposition to independence] [to Pakistan] or [Pakistanism]" Conversation like this raises inference of discrimination on the basis of plaintiff's religion, religious affiliation. Declaration of plaintiff at 4 ¶ 25.

2. Some weeks before Plaintiff's termination, plaintiff had a discussion with his supervisor, Amy Shawver Morman that he will give her update about some of the work progress in two to three weeks and plaintiff also said to her that I am writing an application to Department of homeland security and trying to remember some events exactly as what happened in the past during that conversation. At parking lot referring to that application Amy Shawver Morman asked what it is about? Plaintiff replied its regarding some political and religious matter. After Amy Shawver Morman asked plaintiff what's the matter regarding religion? plaintiff replied people are irrational about religion especially from my country or Asian subcontinent. Surrounding the event, Amy Shawver also asked plaintiff "Did we hire a criminal? Declaration of plaintiff at 4 ¶ 26.

3. Mathwich Tyler, a team member, who was closely associated with plaintiff regarding his employment at Job Service North Dakota and had decision making power regarding plaintiff's employment pursuant to cat's paw theory, as he was closely associated with Amy Shawver Morman in plaintiff's team commented on June 21 •1, 2018, "so, a master's degree holder like you are not going to throw a bomb, are you? He also commented "the security concerns are overblown" . see section A. at 12 ¶  36. this comment raises inference based on plaintiff's religion as "terrorist" plaintiff was perceived by JSND during the time of plaintiff's entire employment. And expressing it after plaintiff was forced to sign a resignation lettter or "plaintiff was done "see Plaintiff Exhibit Msjl at 16 ¶ 11 on that Day . Amy Shawver Morman was located next to plaintiff's desk when this comment was made. Raises reasonable inference of discrimination based on religion considering the circumstance or plaintiff was getting terminated because of his religion.

4. When all other team member had laptop, all the similarly situated team members, plaintiff as a full-time classified employee was not assigned any laptop similar to All team members decorated their desk during chrismas but plaintiff did not decorate. Raises circumstances based on religion considering him as someone who is going to throw bomb using office laptop.

5. Plaintiff received some documents in his mailbox that had something roughly similar to that effect while employed at Job service North Dakota "internet access at Plaintiff's home will be monitored". Until this point of lawsuit plaintiff was not able to find any state administrative code requires that employee's internet access should be monitored when plaintiff was not assigned any official laptop while working at Job service North Dakota raises inference of discrimination based on religion. Declaration of Plaintiff at 4 ¶ 21.

(Doc. No. 52- at pp. 31-32) (errors in original).

Because Hossain has presented no direct evidence of discrimination, the court shall evaluate his claim under the <u>McDonnell Douglas</u> framework. For the reasons previously discussed, Hossain has not suffered an adverse employment action for purposes of Title VII.  Moreover, the circumstances as he has framed them do not give rise to an inference of religious bias or discrimination.  Absent more, the mere fact that someone asked him questions about his religion does not provide a foundation on which to base a claim for religious discrimination. The same can be said with what appears to be a stray comment by a coworker. Finally, Hossain has presented nothing to suggest that the legitimate, nondiscriminatory reasons articulated by JSND for its decision not to enroll in E-Verify and to issue a pre-action notice were pretextual.

### f.    National Origin Discrimination

Hossain claims that JSND discriminated against him on the basis of his national origin.  As direct evidence of this discrimination, he cites comments made by his interviewer during the hiring phase that " English is a second language, so he has a slight accent which our staff will need to get used to but it's managable."  (Doc. No. 52 at p. 14) (errors in original).  He also cites pre-employment inquiries about his employment authorization, Shawver-Morman's statement that " you keep half of your sentence inside you, express rest of the half, get excited in the middle of your talk that's part of the problem too," comments by Sutheimer about EADs and part-time work, comments from some of coworkers, and unspecified documents that he received in the mail.

These comments at issue can fairly be characterized as stray remarks that are facially neutral, and fairly innocuous.  They are not connected to any adverse employment decision.  This is particularly true of the interviewer's purported comments.  If anything, the comment by the

interviewer about Hossain's accent does not reflect animus or bias but rather a belief that Hossain's accent was a non issue.  The statement attributed by Hossain to Shawver-Morman is likewise facially neutral and innocuous.  As for Suthheimer's comments, they do not reflect and do not otherwise appear to be inappropriate given the context in which they were made–during a meeting with Hossain to discuss his employment authorization and the employment opportunities that were currently available to him.

Insofar as Hossain's claim may be predicated upon indirect as opposed to direct evidence, it still fails. The indirect evidence on which Hossain bases his claim of national origin discrimination is ostensibly the same evidence on which he based his claim of race discrimination.  For the reasons previously discussed, Hossain has not suffered an adverse employment action for purposes of Title VII.  Even if he had, JSND has proffered legitimate, nondiscriminatory bases for its actions that Hossain has not demonstrated, much less alleged, were pretexual. For these reasons, Hossain's claim does not survive summary judgment.  The court shall now move on to address Hossain's hostile work environment claim.

### g.    Hostile Work Environment

Hossain claims that he was subjected to harassment based on protected characteristic, i.e., his race, sex, religion, and national origin and that he suffered great stress and anxiety as a result. The various comments and conduct that form the basis for Hossain's other claims of discrimination form the basis for his hostile work environment.

JSND asserts that Hossain's claim rests on stray comments made by co-workers and does not imput knowledge of a hostile work environment or claims of harassment to decisionmakers at JSND.  It further asserts that there is dearth of evidence to even remotely suggest that

decisionmakers were aware of any harassment or claims of harassment regarding any protected category and that Hossain has therefore failed to state a prima facie claim.

In response, Hossain asserts simply that JSND can be held liable under the "cat's paw theory" as decisionmakers were influenced by other employees who did have a discriminatory motive.

Title VII recognizes an employees' entitlement to a workplace free of "discriminatory intimidation, ridicule, and insult" motivated by the employees' membership in a protected class. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–22 (1993). "All instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII if they are part of a course of conduct which is tied to evidence of discriminatory animus." Carter, 173 F.3d at 701.

"To actually alter the terms and conditions of employment, conduct must be severe and pervasive, both objectively and subjectively." Gonzalez v. City of Minneapolis, 267 F. Supp. 2d 1004, 1015 (D. Minn. 2003) (citing Duncan v. General Motors Corp., 300 F.3d 928, 933 (8th Cir. 2002)). "Factors to consider when determining the severity and pervasiveness of an employer's conduct include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." Id. "One-time incidents, unless severe, are insufficient to establish the level of harassment necessary to prove a hostile environment." Soto, 285 F. Supp. 2d at1168 (N.D. Iowa 2003). "Further, sporadic and casual comments are also unlikely to support a hostile environment claim." Id. (citing Cram v. Lamson & Sessions, Co., 49 F.3d 466, 474 (8th Cir.1995), and Johnson v. Bunny Bread Co., 646 F.2d 1250, 1257 (8th Cir.1981)); see also Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (stating that "Title VII does not prohibit genuine but

innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex and that "offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the  terms and conditions of employment" (internal quotation marks omitted)).

The comments on which Hossain relies are of the sporadic and casual variety.  Most if not all of the comments appear to be innocuous or facially neutral.  The fact that Hossain took offense to them does not necessary mean they are actionable.  As noted above, the conduct at issue must be both objectively and subjectively severe.

As JSND has correctly pointed out, the comments made by co-workers cannot be imputed to decisionmakers.  See Wilke v. Dep't of Health & Human Servs., 638 F.3d 944, 952-54 (8th Cir. 2011).  Moreover, the record is devoid of any evidence to suggest that decisionmakers were aware of the comments of Hossain's coworkers or of Hossain's concerns.

Hossain's "cat's paw theory" falls apart under scrutiny.  The record reflects that Sutheimer and Shawmer-Morman were two of Hossain's biggest advocates at JSND.  Sutheimer initiated the E-Verify enrollment process at JSND.  Shawman-Morman made contact with others outside of JSND in an effort to locate someone who could provide Hossain with legal assistance.  Both repeatedly met with Hossain to discuss his options and to otherwise offer their assistance.  If they had the level of influence that Hossain has suggested, it would stand to reason that JSND would have charted a different course continuing with the E-Verify enrollment process instead of terminating it.

In any event, Hossain has presented nothing to suggest that his allegedly harassment affected a term or condition of his employment.  JSND was obviously aware of his national origin when it

hired him.  Hossain knew when starting his time at JSND that his time there was finite as his work authorization expired on June 26, 2019.  In regards to the laptop and Hossain's assertion that, unlike other employees, he was not assigned one upon completing his probationary period whereas others were, the court again notes that he had, by his own admission, a work computer and otherwise had computer access as evidenced by his ability to send emails and instant messages.  Hossain's hostile work environment claim is therefore subject to summary judgment.  The court shall now turn to Hossain's claim fo retaliation.

**h.    Retaliation**

Hossain claims that JSND retaliated against him for engaging in a protected activity, i.e., reporting JSND's mistreatment, harassment and discrimination conduct to the Department of Homeland Security in his asylum application, and seeking the assistance of counsel.  In so doing, he asserts that JSND knew or could have known the contents of his asylum application as it was saved on his work computer.  Additionally, he stresses that he had made several complaints about his treatment during the course of his employment to Suthheimer and Sharwan-Morman and that he further advised them of his intent to retain counsel and explore his legal options following JSND's eventual refusal to enroll in E-Verify.   In his eyes, the retaliation ostensibly was JSND's decision not to enroll in E-Verify and issuance of the pre-action notice. It cannot be his termination as he was not fired by JSND but resigned six days before the expiration of his work authorization.

JSND asserts in its motion  that Hossain's claim of retaliation fails because no one would reasonably believe that the incidents reported by Hossain violated Title VII, that Hossain's conversations with his superiors did not constitute protected activity, that Hossain suffered no adverse employment action, and that Hossain could not demonstrate there was a causal connection

between an adverse employment action and his engagement in any protected activity.  See Orluske v. Mercy Med. Ctr.-N. Iowa, 455 F. Supp. 2d 900, 920 (N.D. Iowa 2006) ("Where no one could have reasonably believed that the incident reported by the plaintiff violated Title VII (or the underlying statute), the plaintiff's retaliation claim fails."); see also Gray v. City of Valley Park, Mo., No. 4:07CV00881 ERW, 2008 WL 294294, at *18 (E.D. Mo. Jan. 31, 2008) (noting the voluntary nature of the employment verification programs established by Congress for employers).

Hossain disagrees, asserting that he did engage in a protected activity and that it cost him the opportunity to obtain a "STEM extension" and with it continued employment.

Plaintiff went to Jason sutheimer's Room to officially present those I-20 documents as requirements and in order to ask some questions related with those I-9 documents. ECF # 51-12 at 16-17. During the conversation, toward end of the meeting, Jason Sutheimer stated to plaintiff something similar "that number will not work" or "that number did not work". Plaintiff reasonably felt something adverse to his employment. Plaintiff expressly opposed Jason Suthimer
stating ""I currently have a 1-20 or I-9 document issued by Department of Homeland Security and they issued two years of work Authorization" and again presented those documents to Jason sutheimer in an asserting or expressly opposing manner. Declaration of Plaintiff at 2 ¶ 5.

After this opposing event or protected activity, everything started to deteriorate as next day On June 19 th, 2018, Jason Sutheimer told plaintiff they have canceled E-Verify account and will not accept plaintiff's 1-9 document in his possession and also commented that "I should work for $10/hr Job". Declaration of plaintiff at 216. See Section A. at 7,8 ¶ 28,29

Causal connection can be established as Darren Brostrom testified "On or around June 18, 2018, a discussion was held relating to E-Verify and whether JSND should enroll into E-Verify. This conversation was between Michelle Kommer, the JSND Executive Director at that time, and me. To the best of my recollection, the discussion occurred because we had a request from HR to enroll in E-Verify to assist an employee". Decl. Brostrom at 216.

Protected activity on June 18, 2018 Declaration of plaintiff at 2 ¶ 5 caused Jason Sutheimer to influence upper decision makers to take decision which is going to affect plaintiff adversely because of expressly opposing activity. See Section A. at 7,8 ¶ 28,29.

On June 19th ,2018 plaintiff hired an attorney in order to save his job. see Plaintiff Exhibit Msjl at 17, 18. or preventing employer from further make his employment terms worse.

On June 20th ,2018 Plaintiff argued, opposed and asserted his right with the help of attorney to the extent possible. Finally , during that event when plaintiff was presented with a termination letter and again plaintiff wanted to send those documents to USCIS , Jason Sutheimer then threatened to jeopardize plaintiff immigration status as well as asylum case and wanting plaintiff to put into immigration fraud . Plaintiff was forced to sign a termination letter. See Section A.at 10 ¶ 3 l.

(Doc. No. 52 at pp. 16-17) (errors in original).

Assuming Hossain had engaged in a protected activity for purposes of Title VII the court finds that he has not established that he suffered an adverse employment action for the reasons discussed above.

Even if he could establish that he suffered from an adverse employment action, he has failed to demonstrate any linkage between this action and his engagement in protected activity.  As a decisionmaker at JSND, Bromstrom, has attested under penalty of perjury that neither he nor Krommer, JSND's other decisionmaker, had any knowledge of Hossain's asylum application, its contents, or Hossain's other purported issues with his coworkers at JSND when deciding to  forego JSND's enrollment in E-Verify.  In contrast, Hossain has provided nothing more than conjuncture that decisionmakers were aware of the contents of his asylum application by virtue of the fact that it was saved on his work computer.  It is also worth noting (again) that by, all appearances, there would not have been a request for E-Verify enrollment before Bostrum and Krommer  if not for the efforts undertaken by Suthheimer on Hossain's behalf, and that Sharwan-Morman also had undertaken efforts to put Hossain in touch with an attorney who could assist him. Finally, it should be noted that JSND has articulated legitimate, nondisciminatory reasons for the decision to forego

enrollment in E-Verify and for its issuance of the pre-action letter. Notably, Hossain has presented nothing to suggest these reasons are mere pretext. For these reasons, Hossain's retaliation claim does not survive summary judgment. The court shall now move on to address Hossains state law claims.

### B.    Hossain's State (NDHRA) Claims

JSND seeks dismissal of Hossain's claims under the NDHRA on grounds of sovereign immunity and Hossain's noncompliance with N.D.C.C. § 32–12.2–04(1).

Federal courts have supplemental jurisdiction under 28 U.S.C. § 1367(a) over state law claims that arise from a "common nucleus of operative fact" with a federal question claim, such that they form a single "constitutional case." Raygor v. Regents of Univ. of Minn., 534 U.S. 533, 539 (2002) (quotation marks and citation omitted). This court has jurisdiction over Hossain's state law claims only if the State of North Dakota has waived its sovereign immunity as guaranteed under the Eleventh Amendment, since "§ 1367(a)'s grant of jurisdiction does not extend to claims against nonconsenting state defendants." Id. at 541. The State of North Dakota has specifically preserved its Eleventh Amendment sovereign immunity. N.D.C.C. § 32–12.2–10. Consequently, this court has no subject matter jurisdiction to hear Hossain's NDHRA claims..

Even if the State had not preserved its Eleventh Amendment immunity, this court would lack subject matter jurisdiction over Hossain's NDHRA claims for another reason–Hossain's noncompliance with N.D.C.C. § 32–12.2–04(1).

N.D.C.C. § 32-12.2–04(1) requires that claims against the state or state employees be presented to OMB within 180 days after the injury is discovered. Specifically, it provides:

> A person bringing a claim against the state or a state employee for an injury shall present to the director of the office of management and budget within one hundred

eighty days after the alleged injury is discovered or reasonably should have been discovered a written notice stating the time, place, and circumstances of the injury, the names of any state employees known to be involved, and the amount of compensation or other relief demanded.

N.D.C.C. § 32–12.2–04(1).  The term "injury" as used in N.D.C.C. § 32–12.2–04(1) encompasses "bodily injury, mental injury, sickness, or disease sustained by a person and injury to a person's rights or reputation."  N.D.C.C. §§ 32-12.2.01(2) and (4).

JSND asserts that the notice-of claim-requirement is a jurisdictional prerequisite that Hassan has not satisfied and that his NDHRA claims must therefore be dismissed.  See Ungar v. N.D. State Univ., 2006 ND 185, ¶¶ 22, 721 N.W.2d 16; State v. Haskell, 2001 ND 14, 621 N.W.2d; see also Moe v. Univ. of N. Dakota, No. CIV A2-98-123, 1999 WL 33283359, at *1 (D.N.D. Mar. 23, 1999). The court agrees.

It is well-settled that, in order to bring a legal action against the state pursuant to the NDHRA, a plaintiff must first satisfy N.D.C.C. § 32–12.2–04(1)'s notice of claim requirement. Should a plaintiff fail to satisfy this requirement, his action is subject to dismissal for lack of jurisdiction.  See State v. Haskell, 2001 ND 14, 621 N.W.2d (concluding that a plaintiff's failure to present her NDHRA claim in compliance with N.D.C.C. § 32–12.2–04 rendered the trial court without jurisdiction); Cooke v. Univ. of N.D., 1999 ND 238, 603 N.W.2d 504 ("If a person suing the state fails to satisfy N.D.C.C. § 32–12.2–04(1)'s notice of claim requirement, dismissal of the person's complaint is proper."); Moe v. Univ. of N. Dakota, No. CIV A2-98-123, 1999 WL 33283359, at *1 (D.N.D. Mar. 23, 1999) (dismissing a plaintiff's action under the NDHRA on account of her noncompliance with N.D.C.C. § 32–12.2–04(1)'s notice of claim requirement).

Hossain claims that he was subjected to a hostile work environment, retaliated against, and otherwise discriminated against on the basis of his race, color, gender, religion, national origin, and

marital status while employed by JSND and/or when applying for reinstatement/re-employment with JSND in violation of the NDHRA. The injuries he allegedly suffered as a result (mental injury and injury to his rights or reputation) are the type for which a notice of claim is required.

Hossain has failed to present any evidence by affidavit or otherwise that he presented a written claim for compensation to OMB as required by N.D.C.C. § 32–12.2–04. For this reason, his claims under the NDHRA are dismissed for lack of jurisdiction.

## IV.    **CONCLUSION**

There is a cynical expression commonly used by Americans and perhaps others that "no good deed goes unpunished." JSND and its employees may feel that this expression adequately and succinctly summarizes what has transpired in the wake of their efforts to assist Hossain.

Hossain did not like the outcome of his employment at JSND. His dislike of the outcome does not constitute the basis for cognizable claims of employment discrimination, however. Hossain has failed to make out prima facie claims of discrimination under Title VII. His IRCA and HSND claims are subject to dismissal for the reasons discussed above. JSND's Motion for Summary Judgment (Doc. No. 49) is therefore **GRANTED**. Hossain's case is dismissed in its entirety. The Clerk's office shall enter judgment accordingly. The court certifies that an appeal of the dismissal of this action cannot be taken in good faith.

**IT IS SO ORDERED.**

Dated this 11th day of April, 2023.

*/s/ Clare R. Hochhalter*
Clare R. Hochhalter, Magistrate Judge
United States District Court

41